Jeffrey N. Goldberg (SBN 217555)
jeff@jeffreyngoldberglaw.com
THE LAW OFFICES OF JEFFREY N. GOLDBERG, P.C.
11601 Wilshire Blvd., Ste 500
Los Angeles, California  90025
Tel.:   (310) 765-2988
Fax:   (310) 943-2765

Attorney for Plaintiffs
Crypto Asset Fund, LLC,
Timothy Enneking & Kyle Chaykowski

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CRYPTO ASSET FUND, LLC, a Delaware limited liability company; TIMOTHY ENNEKING, an individual; and KYLE CHAYKOWSKI, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> MEDCREDITS, INC., a Delaware corporation; JAMES TODARO, an individual; JOSEPH TODARO, an individual; JOHN TODARO, an individual; MOSHE PRAVER, an individual; RYAN CODY, and individual; BLOCKTOWN HOLDINGS, LP dba BLOCKTOWN CAPITAL, a Delaware limited partnership; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO.: '19 CV 1869 BEN MDD <br><br> **COMPLAINT FOR:** <br><br> **VIOLATIONS OF (1) THE SECURITIES ACT OF 1933, (2) THE SECURITIES EXCHANGE ACT OF 1934, (3) CALIFORNIA'S CORPORATE SECURITIES LAW OF 1968 & (4) CALIFORNIA'S UNFAIR COMPETITON LAW AND CLAIMS FOR (5) BREACH OF CONTRACT, (6) BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING, (7) UNJUST ENRICHMENT, (8) CONVERSION, (9) PROMISSORY ESTOPPEL, (10) FRAUD, (11) NEGLIGENT MISREPRESENTATION & (12) INTENTIONAL INTERFERENCE W/ CONTRACTUAL RELATIONS** <br><br> **AND DEMAND FOR JURY TRIAL** |

- 1 -
COMPLAINT AND DEMAND FOR JURY TRIAL

## **JURISDICTION**

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa because Plaintiffs allege violations of the Securities Act of 1933 and Securities Exchange Act of 1934.

2.     This Court has personal jurisdiction over Defendants because Defendants either conduct business in this District or are present in this District for jurisdictional purposes.  Defendants have sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Defendants solicited investors in this District and obtained money or valuable cryptocurrency from those investors, including Plaintiffs.

3.     Defendants have purposefully availed themselves of the benefits of operating in this jurisdiction, and this Court may exercise personal jurisdiction over Defendants.

## **NATURE OF THE ACTION**

4.     Plaintiffs bring this action against Defendants for their violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), California's Corporate Securities Law of 1968 (the "California Securities Law"), and California's Unfair Competition Law and for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, promissory estoppel, fraud, negligent misrepresentation, and intentional interference with contractual relations.

5.     Plaintiffs seek rescission, compensatory damages, including lost profits, restitution, disgorgement of profits, pre- and post-judgment interest at the statutory legal rate of 10% pursuant to Section 3289(b) of the California Civil Code, awards of costs and attorneys' fees pursuant to Section 1021.5 of the California

Civil Code, and punitive damages in an amount sufficient to punish and deter Defendants.

6.    Plaintiffs also seek injunctive relief to enjoin Defendants' unfair, unlawful, and fraudulent business acts and practices, including an order prohibiting Defendants from continuing to offer and sell unregistered, non-exempt securities.

## **PARTIES**

7.    Plaintiff Crypto Asset Fund, LLC ("CAF") is a Delaware limited liability company with members who reside in California.  Plaintiffs Timothy Enneking and Kyle Chaykowski are individuals who reside in San Diego County, California.

8.    Plaintiffs are informed and believe that defendant MedCredits, Inc. ("MedCredits") is a Delaware corporation with its principal place of business in Delaware.

9.    Plaintiffs are informed and believe that defendants James Todaro, Joseph Todaro, and John Todaro (the "Todaro Brothers"), Moshe Praver, and Ryan Cody (collectively, the "Individual Defendants") are individuals residing within the United States.

10.    Plaintiffs are informed and believe that James Todaro and Moshe Praver are Executive Officers and Directors of MedCredits and that Joseph Todaro, John Todaro, and Ryan Cody are Directors of MedCredits.

11.    Plaintiffs are informed and believe that defendant Blocktown Holdings, LP dba Blocktown Capital ("Blocktown Capital") is a Delaware corporation with its principal place of business in Michigan.

12.    Plaintiffs are informed and believe that James Todaro is an Executive Officer of Blocktown Capital.  James, Joseph, and John Todaro are identified as members of Blocktown Capital's Management team on its website.[1]

---

[1] https://www.blocktown.capital/team

13.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Does 1 – 10 and therefore sue said Defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities when the same has been ascertained.  All of the Doe Defendants and each of them were the agents and principals of all of the other defendants and were acting in the course and scope of their authority and in concert with one another.

## VENUE

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa because:  (a) the conduct at issue took place and had an effect in this judicial District; (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (c) Defendants have received substantial compensation and other transfers of money by transacting business in this District and engaging in activities that have an effect in this District.

## FACTUAL ALLEGATIONS

15.     On July 25, 2017, the Securities and Exchange Commission ("SEC") issued an investigative report (commonly referred to as the "DAO Report") cautioning market participants that offers and sales of digital assets conducted by organizations using distributed ledger or blockchain technology are subject to the requirements of the federal securities laws. The SEC explained that "[s]uch offers and sales, have been referred to, among other things, as 'Initial Coin Offerings' or 'Token Sales.'"[2]

16.     In the fall of 2017, on the heels of the SEC's issuance of the DAO Report, MedCredits and the Individual Defendants launched an aggressive private and public campaign to market their planned initial coin offering of the MEDX token for use on a "token-curated registry" ("TCR") of physicians whereby a

---

[2] https://www.sec.gov/news/press-release/2017-131

network of "verified" physicians would be established through a "decentralized" peer review process.

17.     Beginning in or around September 2017, James Todaro began to solicit and induce Mr. Enneking to invest in MedCredits' upcoming token sale for the yet-to-be-launched MedCredits (MEDX) platform.  Mr. Todaro represented in an email to Mr. Enneking that he and his team of partners "uniquely possesses the blockchain space knowledge and medical background to launch a successful health platform." Mr. Todaro claimed that as "US medical doctors" they possessed a "great deal of insight and connections into the healthcare sector to be the first movers in blockchain based telemedicine."

18.     James Todaro represented that they were "on the conservative side" regarding their timeline for building out their platform, launching a successful token sale, and other key deliverables.

19.     In December 2017, James Todaro provided Mr. Enneking with "a few updates on the MedCredits platform."  Acknowledging that one of Mr. Enneking's "concerns was the timeline of [their] development progress," James Todaro represented that they were "significantly ahead of schedule," claiming that they had just completed development of the alpha version of their app and were "the first team to ever create a truly decentralized telemedicine platform."

20.     James Todaro also reported that they had "revamped [their] website and white paper with the updated timeline and development framework."  "White Papers" are an industry standard document in which offerors of digital tokens describe their platform and token to potential investors.  These White Papers were neither independently nor objectively prepared – they were specifically designed to persuade the investing public to buy token securities.

21.     James Todaro also reported that they had "just recently launched [their] Seed Round where [they were] selling discounted MEDX tokens to hand picked qualified buyers."  Emphasizing that "[t]hese [MEDX tokens] will be priced lower

than the Pre-sale and Public Sale tokens," he stated:  "We are ideally looking for Seed Round buyers who we know in the blockchain space, which is why I'm reaching out to you."  James Todaro concluded his pitch by stating:  "I strongly believe that we are the most robust blockchain healthcare company in the space. Please let me know if you are still interested."

22.     When Mr. Enneking inquired regarding "the investment structure you are currently offering," James Todaro responded by providing Mr. Enneking with a MEDX token distribution and pricing chart reflecting a Pre-Sale price of 0.40 USD per MEDX and tiered Public sale prices going up to 0.80 USD per MEDX.  Mr. Todaro indicated that "Seed Round prices are determined on a case-by-case basis, but has been around 0.25 to 0.30 USD per MEDX."  In an effort to further induce Plaintiffs into investing in MEDX tokens, Mr. Todaro added:  "We may be able to offer you a further discount if you are interested in an advisory role."

23.     Around the same time that James Todaro was reporting the supposed commencement of MedCredits' MEDX token sale, a different healthcare company called MediBloc founded in April 2017 *did* hold a token sale for – guess what – "MEDX" tokens.[3]  This material information – all but guaranteeing market confusion should MedCredits ultimately launch *its* MEDX token – was not disclosed to Plaintiffs notwithstanding that appropriate due diligence by MedCredits and the Individual Defendants should have revealed or did reveal it to them.

24.     In early January 2018, James Todaro followed up with Mr. Enneking again, emailing in part:

> I'm not sure if you saw this, but we just released a demo
> video of the alpha version of our Hippocrates app. This is
> the first decentralized telemedicine platform ever
> developed. The case files and images are stored on IPFS,

---

[3] https://medibloc.org/en/about and https://coinmarketcap.com/currencies/medx/

and Ethereum smart contracts control the physician-
patient encounter. We will be rolling this out to token
sale participants in the very near future for testing. We
expect to have the Beta Release coming out during our
public token sale.

On a separate note, we have nearly $2mm in registrants
for our Seed Round, (which means there is a growing
waitlist). We are reserving a substantial portion of this
round though for contributions by funds/people who are
leaders in this space.

25.    Plaintiffs carefully considered the offer to purchase based upon the information reasonably available to them at the time, much of which was controlled exclusively by MedCredits and the Individual Defendants.

26.    Ultimately persuaded to invest, in January 2018, CAF purchased $1.3 million worth of MEDX tokens at $0.20 USD per token and Mr. Enneking entered into an advisory agreement with MedCredits.  The following month, Mr. Chaykowski purchased $50,000 worth of MEDX tokens at $0.25 per token. MedCredits and the Individual Defendants never rolled out the MEDX platform, never completed the MEDX token sale and distribution, apparently abandoning the project altogether while pocketing funds from investors including Plaintiffs to use as they see fit – in the case of the Todaro Brothers in connection with Blocktown Capital.

27.    At the time of Plaintiffs' investments, MedCredits communications indicated the company planned to distribute the tokens and list on an exchange within three to six months.

28.    Unbeknownst to Plaintiffs at this time, MedCredits and the Individual Defendants had no reasonable expectation, ability, or intention of developing a fully

COMPLAINT AND DEMAND FOR JURY TRIAL

functioning platform or successfully completing a token sale and distribution within this timeline or at all.

29.     Moreover, the Todaro Brothers knew that they intended to devote significant resources, including finite time and money including the proceeds from purchases of MEDX tokens, that Plaintiffs reasonably expected and relied upon them to devote to the MEDX platform and token instead to launching and operating Blocktown Capital.  Indeed, while the proceeds from Plaintiffs' purchases of MEDX tokens were supposed to be held and utilized for the sole and exclusive benefit and use of MedCredits which in turn would inure to the benefit of its investors including Plaintiffs, those proceeds were instead misappropriated, commingled, and/or misapplied by the Individual Defendants and Blocktown Capital.  The blockchain technology utilized by Defendants to sell MEDX tokens allows the outflow of investor proceeds to be traced.

30.     MedCredits and the Individual Defendants never followed through on the various deliverables that would be required to successfully launch and operate the MEDX platform and to complete the accompanying token sale and distribution. Instead, they devoted significant efforts to founding and launching Blocktown Capital.

31.     On March 15, 2018, James Todaro published an article on medium.com promoting the MEDX token called "The MEDX Token – A protocol token to power the MedCredits ecosystem."[4]

32.     On April 24, 2018, James Todaro caused to be filed with the SEC a Form D Notice of Exempt Offering of Securities for Blocktown Capital.  As of this date, no such Form had been filed by MedCredits for the MEDX tokens. Throughout 2018 and into 2019, James Todaro continued to assure Plaintiffs that appropriate resources were being devoted to the severely lagging MEDX project,

---

[4] https://medium.com/medxprotocol/the-medx-token-7bf752b6ae20

including regarding the hiring of a marketing specialist, while concealing the fact that the Todaro Brothers had already pivoted toward an alternative project in Blocktown Capital and had no intention of following through with the MEDX project generally or with the specific representations that were made to investors including Plaintiffs.

33.    On August 2, 2018, MedCredits and the Individual Defendants made material misrepresentations and omissions to Plaintiffs regarding the status of the MedCredits platform and MEDX token sale and distribution, including regarding their marketing strategy and engagements, partnerships, press, and platform developments.

34.    On November 5, 2018, James Todaro advised Mr. Enneking in an email:  "On the marketing front, we have begun interviewing healthcare marketing strategists. Will update you on how the process is going soon!"

35.    The next day, Mr. Enneking pointedly asked James Todaro in an email: "Do you have the bandwidth to follow up on everything and still move ahead on the launch?"  James Todaro responded, "Yes, we do!"  That was a lie.

36.    On November 9, 2018, James Todaro advised Mr. Enneking in an email:

> After multiple rounds of interviews, I'm happy to let you know that we just brought a marketing specialist on board with MedX! He's from Chicago with 18 years of experience in media relations and marketing in healthcare. He has a great contact list of healthcare influencers, and has significant experience leading teams in reputation building and provider/organization on-boarding. He starts Monday and will be an integral part of the OpenCare marketing campaign.

Mr. Todaro's statements contained material misrepresentations and omissions. James Todaro failed and refused to identify this alleged marketing specialist to Plaintiffs.

37.   On March 8, 2019, *almost a year after claiming an exemption for Blocktown Capital*, as an afterthought and in an attempt to retroactively construct an argument for exemption for the MEDX tokens, the Individual Defendants caused to be filed with the SEC a Form D Notice of Exempt Offering of Securities for MedCredits (the "Late SEC Filing"). MedCredits' Late SEC Filing did not render the MEDX tokens exempt, however.

38.   On or about April 11, 2019, the SEC released a "Spotlight on Initial Coin Offerings (ICOs)" in which it noted that "[c]ompanies and individuals are increasingly considering initial coin offerings (ICOs) as a way to raise capital or participate in investment opportunities" which "bring increased risk of fraud and manipulation because the markets for these assets are less regulated than traditional capital markets." Among the "5 things you need to know about ICOs" per the SEC were the fact that "ICOs can be securities offerings," "they may need to be registered," and "ICOs may pose substantial risks." The SEC also reiterated its position set forth in the DAO Report: "As SEC Chairman Jay Clayton has stated, tokens and offerings that feature and market the potential for profits based on the entrepreneurial or managerial efforts of others contain the hallmarks of a security under U.S. law."[5]

39.   On August 12, 2019, the SEC announced that it had settled charges against a New England-based blockchain healthcare company for offering and selling approximately $6.3 million of securities to the public in unregistered transactions.

_____
[5] https://www.sec.gov/ICO

COMPLAINT AND DEMAND FOR JURY TRIAL

40.     According to the SEC's Order, in late 2017, SimplyVital Health, Inc. ("SimplyVital") publicly announced its plan to conduct a token sale – an "Initial Coin Offering" or "ICO" – to raise money to further its development of Health Nexus, a "healthcare-related blockchain ecosystem."  In his March 2018 article for medium.com, James Todaro similarly referred to MedCredits as a healthcare-related blockchain ecosystem.

41.     Just as MedCredits planned to do with the MEDX token, SimplyVital offered a new token called Health Cash, or HLTH, which, it stated, would be used as currency in the Health Nexus.  SimplyVital concurrently announced that it would conduct a "pre-sale" of its HLTH tokens, in which it offered investors Simple Agreements for Future Tokens, or SAFTs, under which it sold HLTH tokens that would not be delivered to investors unless and until created by SimplyVital. MedCredits and the Individual Defendants followed the same process.

42.     The SEC's Order found that SimplyVital did not file a registration statement with the Commission or qualify for an exemption from registration before offering and selling HLTH to the public through the SAFTs.  Neither did MedCredits.

43.     Like MedCredits, SimplyVital did not ultimately follow through with its ICO and distribution of HLTH tokens.  However, unlike MedCredits, SimplyVital voluntarily returned to investors substantially all of the funds raised during its pre-sale.[6]

44.     Among other indicia of a securities offering, Defendants touted that the MEDX tokens received in exchange for investors' investments would be worth more than the moneys they paid.  Additionally, Defendants created a sense of urgency for investors including Plaintiffs to make their investments to capitalize on the profit potential of the investment.  Plaintiffs and other investors reasonably

---

[6] https://www.sec.gov/enforce/33-10671-s

expected that the value of MEDX Tokens received in exchange for their investments would grow as the result of MedCredits' successful launch and cultivation of the MEDX platform.

45.    Under the federal securities laws, the definition of a security includes an "investment contract."  The United States Supreme Court has defined "investment contract" as a contract, transaction, or scheme whereby a person invests his or her money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.  *S.E.C. v. Howey*, 328 U.S. 293, 299 (1946).

46.    Plaintiffs and other investors invested their money in MEDX Tokens. Investors paid either U.S. dollars or with cryptocurrency such as Ether to purchase their MEDX Tokens from MedCredits and the Individual Defendants.  Such an investment is the type of contribution of value that creates an investment contract.

47.    By purchasing MEDX Tokens, Plaintiffs joined MedCredits and the Individual Defendants in the "common enterprise" of establishing the MEDX platform, where MEDX tokens would be the established and sole "currency."

48.    Through their words and actions, MedCredits and the Individual Defendants led investors including Plaintiffs to expect a profit from the purchase of MEDX tokens.  MedCredits and the Individual Defendants introduced MEDX tokens as the exclusive means of verifying physicians in the MEDX physician network and made clear to potential investors that the tokens would be issued in a limited supply.  Potential investors logically concluded that the development and growth of the MEDX platform would create additional demand for MEDX tokens and increase their value.

49.    When Plaintiffs invested in MEDX tokens, the MEDX platform had no practical functionality and had not been launched for public use.  Plaintiffs had no power to bring about the full implementation of the platform, and they relied on MedCredits' and the Individual Defendants' managerial and entrepreneurial efforts to make the platform fully available to the public, as MedCredits had promised.

50.     MedCredits and the Individual Defendants have sole control over the money they raised through sales of MEDX tokens and the management of those funds in connection with the MEDX platform.

51.     MEDX token investors had to rely on MedCredits and the Individual Defendants to: (a) market the sale of MEDX tokens and generate publicity by posting on message boards, social media, and other outlets, and (b) raise the necessary funding to finance the build out of the MEDX platform.  Investors have to rely on MedCredits and the Individual Defendants to: (a) manage the funds that have been raised from MEDX token investors, (b) develop and build the MEDX platform, and (c) market the MEDX platform concept to potential users and seek mass adoption of the MEDX platform.

52.     Investors in the MEDX tokens had no power or control over their investments once they handed their payment over to MedCredits and the Individual Defendants.  MedCredits and the Individual Defendants controlled all pertinent information about the company, managed the development of the platform which they have apparently abandoned, and chose what types of information to provide to investors and when that information was disseminated.

53.     The requirements of the Securities Act, the Exchange Act, and the California Securities Law are designed to protect investors by ensuring that they are provided adequate, truthful, and materially complete information upon which to base their investment decisions.  California's Unfair Competition Law is an important law enforcement tool designed to protect consumers from unfair, unlawful, and fraudulent business acts and practices and to deter and punish wrongdoing.

54.     Through this action, Plaintiffs seek relief for themselves, to protect California consumers, and to deter and punish Defendants' wrongdoing.

# CLAIMS ALLEGED

## COUNT 1
### Violation of the Securities Act (15 U.S.C. § 77l(a)(2))
### (Against MedCredits And the Individual Defendants)

55.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

56.     The Securities Act prohibits the offer and sale of a security by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

57.     The Securities Act grants Plaintiffs a private right of action for damages against MedCredits and the Individual Defendants for their violations of this provision.

58.     In marketing the MEDX platform and token to prospective investors, including Plaintiffs, MedCredits and the Individual Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails or by means of a prospectus or oral communication to make an untrue statement of material fact and/or omitted to state a material fact necessary in order to make their statements, in light of the circumstances they were made, not misleading.

59.     MedCredits and the Individual Defendants "offered" and "sold" securities within the meaning of the Securities Act because they solicited Plaintiffs' and others' investments in the MEDX platform and tokens, actively and knowingly participated in the offer and sale of MEDX tokens to Plaintiffs and others, and/or offered or sold MEDX tokens they held or controlled to Plaintiffs.  MEDX tokens are not subject to any applicable exemption.

60.   By reason of the foregoing, MedCredits and the Individual Defendants have violated 15 U.S.C. §§ 77l(a)(2).

61.   MedCredits' and the Individual Defendants' violations of the Securities Act were a substantial factor in causing Plaintiffs damages in connection with their purchases of MEDX token securities.  As such, MedCredits and the Individual Defendants are liable to Plaintiffs for compensatory damages or rescission.

<u>**COUNT 2**</u>
**Violation of the Securities Act (15 U.S.C. § 77o(a))**
**(Against all Individual Defendants)**

62.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

63.   Section 15 of the Securities Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over a person or entity that violated federal securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 77k or 77l of this title, shall also be liable jointly and severally with and to the same as extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).

64.     Defendant James Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  James Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

65.     Defendant Joseph Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Joseph Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

66.     Defendant John Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  John Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

67.     Defendant Moshe Praver is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Praver is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

68.     Defendant Ryan Cody is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Cody is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

69.     The Individual Defendants' roles as "controlling persons" of entities or persons who violated Section 15 of the Securities Act were a substantial factor in causing Plaintiffs damages.

## COUNT 3
### Violation of the Securities Act (15 U.S.C. § 77q(a))
### (Against MedCredits and the Individual Defendants)

70.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

- 15 -

71.     The Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.  15 U.S.C. § 77q(a).

72.     MedCredits and the Individual Defendants unlawfully used interstate commerce and/or the mails to employ a device, scheme, or artifice to defraud purchasers of MEDX tokens, to obtain money or property from those purchasers by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements they made, in light of the circumstances under which they were made, not misleading, and to engage in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon the purchasers of MEDX tokens.

73.     By reason of the foregoing, MedCredits and the Individual Defendants have violated 15 U.S.C. §§ 77q(a).

74.     MedCredits' and the Individual Defendants' violations of the Securities Act were a substantial factor in causing Plaintiffs damages in connection with their purchases of MEDX token securities.  As such, MedCredits and the Individual Defendants are liable to Plaintiffs for compensatory damages or rescission.

## COUNT 4
### Violation of the Exchange Act (15 U.S.C. § 78j(b) & 17 CFR § 240.10b-5 )
### (Against MedCredits and the Individual Defendants)

75.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

76.     The Exchange Act prohibits the direct or indirect use of any means or instrumentality of interstate commerce or of the mails (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

77.     MedCredits and the Individual Defendants knowingly and intentionally or recklessly used interstate commerce and/or the mails to employ a device, scheme, or artifice to defraud investors, to obtain money or property from investors by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements they made, in light of the circumstances under which they were made, not misleading, and to engage in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon the purchasers of MEDX tokens.

78.     Plaintiffs reasonably relied to their detriment on the material misrepresentations made by MedCredits and the Individual Defendants and upon the expectation that they would disclose all material facts relating to Plaintiffs' potential and actual investment in MEDX tokens, including all material facts regarding their ability and plans to release and distribute MEDX tokens to investors.

79.     MedCredits' and the Individual Defendants' lack of appropriate preparation for, intentional and concealed use of limited resources including time and money to launch Blocktown Capital, and failed, if even attempted, execution of the token sale and launch of a functioning MEDX platform proximately caused Plaintiffs damages, including the complete loss of their principal investments and lost profits.

80.     By reason of the foregoing, MedCredits and the Individual Defendants have violated 15 U.S.C. §§ 77q(a) and are liable to Plaintiffs for compensatory damages or rescission.

## COUNT 5
### Violation of the Exchange Act (15 U.S.C. § 78t)
### (Against all Individual Defendants)

81.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

82.     The Exchange Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over a person or entity that violated federal securities laws:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

83.     Defendant James Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  James Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 78t.

84.     Defendant Joseph Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory

authority over it.  Joseph Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 78t.

85.  Defendant John Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  John Todaro is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 78t.

86.  Defendant Moshe Praver is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Praver is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 78t.

87.  Defendant Ryan Cody is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Cody is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 78t.

88.  As "controlling persons," Defendants proximately caused Plaintiffs damages.

## COUNT 6
### Violation of Cal. Corp. Code § 25110
### (Against MedCredits and the Individual Defendants)

89.  Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

90.  It is unlawful for any person to offer or sell in California any security in an issuer transaction that is subject to qualification but has not been qualified and is not exempt.

91.  MedCredits and the Individual Defendants "offered" and "sold" securities within the meaning of the Corporate Securities Law of 1968 because they solicited Plaintiffs' and others' investments in the MEDX platform and tokens, actively and knowingly participated in the offer and sale of MEDX tokens to

Plaintiffs and others, and/or offered or sold MEDX tokens they held or controlled to Plaintiffs.

92.     By reason of the foregoing, MedCredits and the Individual Defendants have violated Cal. Corp. Code § 25110.

93.     Pursuant to Cal. Corp. Code § 25503, Plaintiffs are entitled to rescission to recover the consideration paid for the MEDX token securities, plus interest at the legal rate of 10%.

**COUNT 7**
**Violation of Cal. Corp. Code § 25130**
**(Against MedCredits and the Individual Defendants)**

94.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

95.     It is unlawful for any person to offer or sell in California any security in a nonissuer transaction that is subject to qualification but has not been qualified and is not exempt.

96.     MedCredits and the Individual Defendants "offered" and "sold" securities within the meaning of the Corporate Securities Law of 1968 because they solicited Plaintiffs' and others' investments in the MEDX platform and tokens, actively and knowingly participated in the offer and sale of MEDX tokens to Plaintiffs and others, and/or offered or sold MEDX tokens they held or controlled to Plaintiffs.

97.     By reason of the foregoing, MedCredits and the Individual Defendants have violated Cal. Corp. Code § 25130.

98.     Pursuant to Cal. Corp. Code § 25503, Plaintiffs are entitled to rescission to recover the consideration paid for the MEDX token securities, plus interest at the legal rate of 10%.

COMPLAINT AND DEMAND FOR JURY TRIAL

## COUNT 8
### Violation of Cal. Corp. Code § 25504
### (Against the Individual Defendants)

99.     Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

100.   Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

101.   Defendant James Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  James Todaro is a "controlling person" within the meaning of the California Securities Law.

102.   Defendant Joseph Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Joseph Todaro is a "controlling person" within the meaning of the California Securities Law.

103.   Defendant John Todaro is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  John Todaro is a "controlling person" within the meaning of the California Securities Law.

104.   Defendant Moshe Praver is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Praver is a "controlling person" within the meaning of the California Securities Law.

105.   Defendant Ryan Cody is subject to liability by virtue of his top-level executive position with MedCredits and his significant influence and supervisory authority over it.  Cody is a "controlling person" within the meaning of the California Securities Law.

106.   As "controlling persons," the Individual Defendants are jointly and severally liable to Plaintiffs.

### COUNT 9
### Violation of Cal. Corp. Code § 25401
### (Against MedCredits and the Individual Defendants)

107.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

108.   It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

109.   MedCredits and the Individual Defendants offered and sold securities in California within the meaning of the California Securities Law by means of written and oral communications that included untrue statements of material fact and which omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

110.   By reason of the foregoing, MedCredits and the Individual Defendants have violated Cal. Corp. Code § 25401.

111.   Pursuant to Cal. Corp. Code § 25501, Plaintiffs are entitled to rescission to recover the consideration paid for the MEDX token securities, plus interest at the legal rate of 10%.

## COUNT 10
**Unfair Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**
**(Against all Defendants)**

112.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

113.   The acts and practices of Defendants offend established public policy and/or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  Defendants therefore engaged in unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

114.   Defendants' unfair business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

115.   Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unfair business acts and practices which are ongoing.

## COUNT 11
**Unlawful Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**
**(Against all Defendants)**

116.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

117.   By violating various statutes, rules, and regulations, including without limitation those referenced above and 15 U.S.C. § 77e(a), 15 U.S.C. § 77e(c), Defendants engaged in unlawful business practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

118.   Defendants' unlawful business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

119.   Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unlawful business acts and practices which are ongoing.

## COUNT 12
**Fraudulent Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**
**(Against all Defendants)**

120.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

121.   Defendants' business acts or practices were likely to deceive consumers and therefore Defendants engaged in fraudulent business practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

122.   Defendants' fraudulent business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

123.   Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unlawful business acts and practices which are ongoing.

## COUNT 13
**Breach of Contract**
**(Against MedCredits)**

124.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

125.   Pursuant to MedCredits' offer to sell MEDX tokens, Plaintiffs and MedCredits entered into agreements whereby Plaintiffs purchased MEDX tokens

from Defendants.  Mr. Enneking also entered into an agreement to provide advisory services for MedCredits.

126.   Plaintiffs did all, or substantially all, of the significant things that the agreements required or were excused from having to do so.

127.   MedCredits breached its obligations under the agreements.

128.   MedCredits' breaches of contract were a substantial factor in causing Plaintiffs damages.

## COUNT 14
**Breach of the Covenant of Good Faith and Fair Dealing
(Against MedCredits)**

129.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

130.   Under California law, every contract has an implied covenant of good faith and fair dealing which requires that the parties refrain from doing anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

131.   MedCredits breached the covenant of good faith and fair dealing when it failed to build and launch the MEDX platform, failed to release and distribute MEDX tokens to investors including Plaintiffs, and failed to compensate Mr. Enneking for his advisory services.

132.   MedCredits' breaches of the covenant of good faith and fair dealing were a substantial factor in causing Plaintiffs damages.

## COUNT 15
**Unjust Enrichment
(Against all Defendants)**

133.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

134.   As a result of their failure to build and launch the MEDX platform and failure to release and distribute MEDX tokens to investors including Plaintiffs, Defendants have been unjustly enriched at the expense of Plaintiffs.

135.   Plaintiffs are entitled to recover monies from Defendants to remedy such unjust enrichment, including the return of all purchase proceeds, reimbursement for services rendered, and pre-judgment interest at the statutory legal rate of 10%.

## COUNT 16
## Conversion
## (Against all Defendants)

136.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

137.   Plaintiffs had a right to have MedCredits and the Individual Defendants devote the proceeds of their investments to development of the MEDX platform and to the successful completion of a token sale and distribution of MEDX tokens.

138.   Defendants intentionally and substantially interfered with Plaintiffs' right by failing to develop the MEDX platform and by preventing Plaintiffs from having access to MEDX tokens of any value or at all.  In particular, among other interference by Defendants, the Todaro Brothers misappropriated, commingled, and/or misapplied funds belonging to MedCredits for personal gain and/or for the benefit of Blocktown Capital.

139.   Defendants did so without Plaintiffs' consent.

140.   Defendants' conduct was a substantial factor in causing Plaintiffs harm. In addition to seeking compensatory damages, because of the malicious, oppressive, and fraudulent nature of the conduct of Defendants, Plaintiffs also seek punitive damages in an amount sufficient to punish and deter them.

## COUNT 17
### Promissory Estoppel
**(Against MedCredits and the Individual Defendants)**

141.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

142.   Defendants made a promise to build and launch the MEDX platform and to release and distribute MEDX tokens to investors including Plaintiffs.

143.   Defendants, however, did not intend to perform this promise when they made it.

144.   Defendants intended that Plaintiffs rely on their promise.

145.   Plaintiffs reasonably relied on Defendants' promise.

146.   Defendants did not build and launch the MEDX platform or release and distribute MEDX tokens to investors including Plaintiffs.

147.   Plaintiffs' reliance on Defendants' promise was a substantial factor in causing Plaintiffs harm.

## COUNT 18
### Fraud
**(Against MedCredits and the Individual Defendants)**

148.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

149.   MedCredits and the Individual Defendants had a duty to accurately and completely disclose material information to Plaintiffs regarding the potential investments in MEDX tokens.

150.   MedCredits and the Individual Defendants induced Plaintiffs to purchase MEDX tokens by making material, false representations and/or omissions that they knew to be false and/or materially incomplete or which were made recklessly without regard for their truth.

COMPLAINT AND DEMAND FOR JURY TRIAL

151.   MedCredits and the Individual Defendants intended that Plaintiffs rely on their misrepresentations.

152.   Plaintiffs reasonably relied to their detriment on the material misrepresentations made by MedCredits and the Individual Defendants and upon the expectation that MedCredits and the Individual Defendants would disclose all material facts.

153.   Plaintiffs' reliance was a substantial factor in causing Plaintiffs damages.  In addition to seeking compensatory damages, because of the malicious, oppressive, and fraudulent nature of the conduct of MedCredits and the Individual Defendants, Plaintiffs also seek punitive damages in an amount sufficient to punish and deter them.

## <u>COUNT 19</u>
**Negligent Misrepresentation**
**(Against MedCredits and the Individual Defendants)**

154.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

155.   MedCredits and the Individual Defendants induced Plaintiffs to purchase MEDX tokens by making material misrepresentations and/or omissions for which they had no reasonable grounds to believe to be true and complete.

156.   MedCredits and the Individual Defendants intended that Plaintiffs rely on their misrepresentations.

157.   Plaintiffs reasonably relied to their detriment on the material misrepresentations made by MedCredits and the Individual Defendants and upon the expectation that they would disclose all material facts.

158.   Plaintiffs' reliance was a substantial factor in causing Plaintiffs damages.

## COUNT 20
### Intentional Interference With Contractual Relations
### (Against Blocktown Capital and the Todaro Brothers)

159.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

160.   Blocktown Capital and the Todaro Brothers knew of the agreements between Plaintiffs and MedCredits.

161.   The conduct of Blocktown Capital and the Todaro Brothers prevented performance of those agreements or made performance of those agreements more expensive or difficult.

162.   Blocktown Capital and the Todaro Brothers intended to disrupt the performance of those agreements or knew that the disruption of performance was certain or substantially certain to occur.

163.   The conduct of Blocktown Capital and the Todaro Brothers was a substantial factor in causing Plaintiffs harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment and relief as follows:

A. Declaring the sale of MEDX tokens a security under the federal and state securities laws;

B. Declaring that Defendants offered and sold unregistered securities in violation of federal and state securities laws;

C. Declaring that Defendants are liable to Plaintiffs under the Securities Act, the Exchange Act, the California Securities Law, and California's Unfair Competition Law;

D. Awarding Plaintiffs rescission;

E. Awarding compensatory damages, including lost profits;

1   F.  Ordering Defendants to provide restitution and to disgorge profits to
2       Plaintiffs;

3   G.  Awarding Plaintiffs punitive damages in an amount sufficient to punish
4       and deter Defendants;

5   H.  Awarding Plaintiffs pre- and post-judgment interest at the statutory legal
6       rate of 10% pursuant to Section 3289(b) of the California Civil Code;

7   I.  Awarding Plaintiffs attorneys' fees pursuant to Section 1021.5 of the
8       California Civil Code;

9   J.  Awarding Plaintiffs the costs of this action;

10  K.  Enjoining Defendants and each of them from continuing to offer and sell
11      unregistered, non-exempt securities;

12  L.  Ordering such other and further relief as may be just and proper.

13

14  DATED:  September 27, 2019            Respectfully Submitted,

15

16                                       By: s/ Jeffrey N. Goldberg
                                         Email: jeff@jeffreyngoldberglaw.com

17

18                                       JEFFREY N. GOLDBERG
                                         THE LAW OFFICES OF JEFFREY N.
19                                       GOLDBERG, P.C.

20                                       Attorney for Plaintiffs

21                                       Crypto Asset Fund, LLC, Timothy
                                         Enneking, and Kyle Chaykowski
22

23

24

25

26

27

28

- 30 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

3    jury of all claims in this Complaint so triable.

4

5    DATED:  September 27, 2019          Respectfully Submitted,

6

7                                       By: s/ Jeffrey N. Goldberg
                                        Email: jeff@jeffreyngoldberglaw.com
8

9                                       JEFFREY N. GOLDBERG
                                        THE LAW OFFICES OF JEFFREY N.
10                                      GOLDBERG, P.C.

11                                      Attorney for Plaintiffs

12                                      Crypto Asset Fund, LLC, Timothy
                                        Enneking, and Kyle Chaykowski
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL